Good morning, your honors, and may it please the court. My name is Heather Fraley and I represent the appellant, Thomas Springs. I intend to reserve three minutes for rebuttal. The issue in this case is whether testimony from the 16-year-old son of both the victim and the defendant in this case, that despite what his father had done, he loved his father and wanted him to be part of his life, would have convinced just one juror to strike a different balance. The victim and the defendant in this case shared six children, and the jury that sentenced Mr. Springs to death heard from only one of those children, and that child's testimony was not favorable to Mr. Springs. What the jury didn't hear was testimony from his 16-year-old son, Matthew, that despite what his father had done, his father, quote, may have messed up, but he still had his chance to redeem himself. I want him to know that me and his kids, my brother and sisters, we love him and we care about him more than anything, and I wouldn't want my brothers and sister to lose their father, and I wouldn't want to lose mine, because then it feels like we have nobody. The Arkansas Supreme Court correctly found trial counsel ineffective for failing to present Matthew's testimony to the jury. The issue here is whether that court's determination that the constitutional error was harmless was unreasonable. On the unique facts of this case, the answer to that question is yes. Counsel, was it explored below what strategy, if any, counsel used in order to conclude not to offer the testimony of the son you reference? Your Honor, at the Rule 37 proceeding, trial counsel testified that they didn't speak to the children and they had no strategic reason for not presenting them, and the Arkansas Supreme Court correctly concluded on that basis that their decision not to present Matthew's testimony was objectively unreasonable. So we already have a finding in this case from the Arkansas Supreme Court correctly on deficient performance. The question is whether the court's finding that Mr. Springs couldn't show prejudice was unreasonable, and the answer to that question is yes. So the Arkansas Supreme Court articulated four reasons why Mr. Springs could not satisfy the prejudice requirements under Strickland. That Matthew's statement was not comparable to Jacob, Jacob being the 12-year-old son that the jury did hear from, Matthew being the son that they didn't hear from. Second, that Matthew's statement was cumulative to testimony from neighbors and co-workers that, in their opinion, based on interactions from 10 years ago, Mr. Springs was a good father, that the State would have impeached Matthew appallingly, that they would have impeached this young victim witness by cross-examining him about Mr. Springs' alleged abuse of the children. And finally, that it would have raised a question in the jury's mind about why the other children didn't testify on his behalf. All four of those reasons are objectively unreasonable. First, on the issue of whether Matthew's statement was comparable, controlling authority doesn't require it to be. When the Supreme Court has assessed whether mitigating evidence is prejudice, it has never discussed whether that evidence was comparable to victim impact evidence, because frankly, that's not relevant. Secondly, even assuming that it was relevant, these statements are comparable, because they're both statements from children of both the parents talking about the impact of losing their mother and the potential impact of losing their father. And to the extent that these statements weren't comparable, it was precisely because Jacob didn't say anything favorable about his father. Matthew would have. So if anything, the lack of comparability of the statements weighs in favor of a finding of prejudice. The jury never heard that any of the six children loved their father, never heard from any of the six children that despite what had happened, they wanted a relationship with their father in the future, and they didn't want to lose their only remaining parent. That would have been supremely relevant on the unique facts of this case, where the question before the jury was whether to basically orphan these children. They already lost their mother. The issue the jury had to decide was whether to sentence their only remaining parent to death. And at the end of the day, for better or worse, Mr. Springs was their father. He was their family. And for the jury to hear that at least one of the children didn't want to lose his father, too, absolutely had a reasonable probability of changing the opinion of at least one juror. And that is one of the big problems with the Arkansas Supreme Court's opinion here. The Court never articulates the controlling standard of Wiggins that Mr. Springs didn't have to convince the Court that all 12 jurors would have stricken a different balance. He didn't even have to convince the Court that two jurors would have stricken a different balance. Just one. He just had to show that one juror would have stricken a different balance and voted in favor of life if they had heard this testimony. And the failure to articulate that standard and to properly apply that standard was an unreasonable application of Wiggins. Not only that, the Arkansas Supreme Court failed to consider, as required by Wiggins and other controlling cases, the totality of mitigating evidence. The Arkansas Supreme Court's opinion only mentions the fact that Matthew would have said that his father was a good father and a good provider. And that's true. He would have said that. And that testimony would have been powerful in and of itself. But the Court never acknowledges that Matthew would also have testified he loved his father. He didn't want to lose his father. He didn't want to lose his only remaining parent. He wanted a relationship with his father despite what he had done. That's the kind of evidence that would have made a difference here, that would have convinced one juror to strike a different balance. I'm going to jump ahead a little bit for you. You said appallingly that they would cross-examine him. I'm not sure that I see it as appalling. I think it's quite likely that they would have asked about whether Mr. Springs had abused the now-deceased wife and the children. And at least based on some records, he's likely to have said, yes, including me, Matthew. To me, that would potentially be devastating. What am I missing there? Your Honor, the record is full of examples and reasons why we know the State wouldn't have done that. So first of all, the State didn't do so even though it had the opportunity to do so. So as the State points out in that briefing, the State, excuse me, Mr. Springs presented testimony from approximately six witnesses, neighbors, co-workers, clergy members, that in their opinion, Mr. Springs was a good father. The State could have cross-examined those witnesses. Well, were you aware that Mr. Springs abused the children? Chose not to do so. If they wouldn't have cross-examined neighbors and other people on this, to cross-examine this poor boy, this victim? But did they have a record that suggested that the neighbors were aware of that like they do with Matthew? Well, that's not clear, Your Honor, but even setting that aside, another reason we know from the record that the State wouldn't have done this is that they didn't do so when given the opportunity at the Rule 37 hearing. Matthew testified at the Rule 37 hearing about what he would have said. The prosecutor declined to cross-examine him at all. If the State wouldn't even cross-examine Matthew on these records for any basis in front of a judge, there's no reason to suggest they would have done so in front of a jury. Is that part of the record in this case, any State involvement from social services? Are you asking if the jury heard about involvement from social services? Yes, Your Honor. So both in the prosecutor and the defense's opening statements, they refer to the fact that she was living in a crisis center, that there was a protective order, and that DHS had been involved in the family. But not only that, an employee of DHS testified at the guilt phase of trial, Your Honor. And in fact, the person that testified, his name was Williams, who testified at the guilt phase that he worked for DHS, that he knew the family, and that he, in fact, had an appointment with Mr. Springs the afternoon that the murder occurred, that is the exact worker that prepared the report that the State, as alleged, would have been used to cross-examine Matthew. So this witness who prepared these reports was available to the State. He testified at the guilt phase. The State did nothing with that. And so because the State did nothing with that at the penalty hearing, and because, and I think this is truly the most telling part, at the Rule 37, when the only person listening was even a judge, and it was years later, the prosecutor didn't cross-examine Matthew on the records, there's no reason on the record, it's objectively unreasonable to conclude on this record that they would have done so. And it's also important to note, Your Honor, that not only did the State not cross-examine Matthew using those records, the State objected to their admission. At the Rule 37, it was defense counsel that wanted the DHS records in. The State objected. The State didn't want these records in. Part of the reason the State didn't want the records in is because they also showed that the victim abused the children. If the State had cross-examined Matthew at the trial and asked whether Mr. Springs had abused the children, it would have also demonstrated in those exact same records, Your Honor, in this record, that Christina also abused the children. So it's, it is unreasonable to conclude on this record that they would have, that they would have done that. And again, even, even gauging all, all deference, all, all reasonable considerations to the Arkansas Supreme Court, that they would have impeached his, his testimony that his father was a good father, you can't impeach a boy's testimony that he loves his father. They could not have impeached Matthew's testimony that despite everything, he wanted a relationship with his father. That's powerful. And we know that this jury can't. Did the jury reject any of the aggravating circumstances that the State offered? Um, not any of the aggravators that the State actually argued for. So there were additional aggravators on the form, but the State acknowledged in its closing argument that those aggravators didn't apply. Um, I think they had to do with avoiding lawful arrest or, or something. The point is that the, they didn't reject any of the aggravators that the, that the State actually sought. But then weighing on the counterbalance of that, what about, what happened with the mitigators? The jury, at least one of the jurors found, uh, four of the mitigators that were listed and wrote in a mitigator that even based on Jacob's damaging testimony that his father was selfish and would his father tell him one day why he killed his mother, even that the jury found mitigating. And that's why we know in this case that Matthew's testimony would have mattered. If Jacob's testimony was mitigating, there's no question that Matthew's testimony would have been mitigating. We know this jury was grappling with mitigating evidence and cared what the children thought because after closing arguments concluded, there was a record made that one of the jurors was audibly crying. And when, and to the point that the forewoman turned around and asked this juror, are you okay? And when the court questioned her about what happened, this juror said that when defense counsel was talking about the children in his closing, the juror looked at the children and lost it. This jury cared what the children thought. And if they had heard from Matthew, they would have stricken a different balance. Well, how we could assume that we knew precisely why the juror, uh, expressed the emotions given the gravity of all of the facts in this case. You have a mother in the presence of her children, uh, stopped in a violent way on a street and stabbed double digit times in the presence of the children. It's one of the most horrific things anyone could observe or even hear about. Uh, so I'm not sure we can know precisely what the jurors motives for their emotional expressions were. And I see I'm running out of time and I just want to make one, one statement of that and then I'll reserve the remaining part of my time. Your Honor is correct. The facts of this case are bad. But on the unique facts of this case where it did involve a man killing his wife and they have six surviving children, testimony from the children, or at least one of them, that despite everything, they didn't want to lose their remaining parent is precisely the type of testimony that would have made a difference in this case. And with that, I'll reserve the remainder of my time. Thank you. Thank you, Ms. Fraley. Ms. Gassaway. May it please the court, Thomas Springs spent decades threatening, abusing, and terrorizing his wife, Christina, before killing her in front of her sister and her three year old niece in a busy intersection in Fort Smith, Arkansas. Springs rammed his car into Christina's. He bashed out the car window with his bare hands. Then he stabbed her 24 times, all while she begged for her life. For this crime, Springs was convicted of capital murder and sentenced to death. The issue before this court is whether the Arkansas Supreme Court unreasonably determined that Springs could not demonstrate strickland prejudice from trial counsel's failure to call one of his six children, Matthew, to testify during the penalty phase that Springs was a good dad, a good provider, and that his children loved him. After applying EDPA's highly deferential standard, the district court denied relief. And this court should note that the Arkansas Supreme Court's no prejudice decision was objectively unreasonable such that no fair-minded jurist could disagree to the proper resolution of the claim. In rejecting Springs' ineffectiveness claim, the Arkansas Supreme Court... The state doesn't challenge the ineffective finding, right? No, your honor. The deficient performance prong, we are stuck with what the Arkansas Supreme Court did. Their second prong, the no prejudice determination, was reasonable. The court viewed the totality of the evidence at trial and at the Rule 37 hearing and assessed that evidence against the limited value of Matthew's proposed testimony. And it concluded that Springs could not demonstrate a reasonable probability of a different sentencing outcome. The jury in this case had strong reasons to choose death. The jury heard the gruesome details of Christina's murder in front of her sister, her three-year-old niece, and multiple bystanders. The jury saw photographs of Christina's ravaged body with gaping holes in her back, her chest, her legs, and her hands. And they saw the pools of blood in the car and all over her three-year-old niece's car seat. The jury knew that Springs abused Christina for decades and that she finally escaped a mere five weeks before her death. After she left him, Springs stalked her and repeatedly threatened to kill her. Then, when he was given a chance, he made good on those threats. In the penalty phase, the state presented substantial aggravating evidence. The jury heard that Springs had three prior convictions for second-degree battery and that while he is awaiting trial for capital murder, he threatened to cut a jail guard. The jury also heard from four of Christina's family members, including her 12-year-old son, who gave a moving tribute to his mother and described the devastating effects of her death. As a result, the jury unanimously found three aggravating factors and that those aggravators outweighed the mitigation evidence. Were there any aggravating factors offered not found by the jury? No, Your Honor. Not that the state actually presented evidence for. The three that the state presented evidence on were that the crime was committed in an especially cruel and depraved manner, that Springs had previously committed felonies that involved violence, and that the capital murder put grave risk of death to other people. The addition of Matthew's highly impeachable testimony would not have resulted in a different sentencing. Had Matthew testified that Springs was a good dad and provider, the state would have cross-examined him with the information in the DHS records. And doing so... Why didn't it do so in the Rule 37 hearing? There was no need for the state to do so. At that point, at the Rule 37... Doesn't it help make the point that Matthew's testimony wouldn't have been unequivocally favorable to his father? No. No, Your Honor. Why not? Matthew's testimony was not solely mitigating. There were facts in there. Matthew's testimony also would have said, I love my mom. My mom was wonderful. My mom was my very best friend. Those would have went in favor of death. Also, Matthew's statement said that the children both loved... Matthew would have testified, he abused me and my mother, too. Don't you think that would have helped the state's argument that Matthew's testimony wouldn't have helped the defendant that much? Oh, yes, Your Honor. I must have misunderstood your question the first time. I'm so sorry. Okay. Why wasn't that brought out at the Rule 37? They argue now that the state wouldn't have done it. They didn't even do it at the Rule 37. Again, we just don't see that there was... We don't know why the state chose not to cross-examine Matthew about that at the Rule 37 hearing, but it simply wasn't necessary. The state did enough that both the trial court and the Arkansas Supreme Court rejected his Strickland claim on this issue. Are the DHS records part of the record in this case? Yes, Your Honor. They were introduced during the Rule 37 hearing, and the Arkansas Supreme Court expressly relied on those DHS records in rejecting Springs' claim. Okay. Some of the reasons the Arkansas Supreme Court gave don't make a lot of sense to me. This comparability between Jacob and Matthew's statements. First of all, I'm not sure how relevant that is, and I think the court even noted that, but then the court concluded that they were comparable. It seems to me that Matthew's was significantly more favorable to his father than Jacob's. Yes, Your Honor. It was more favorable to Springs than Jacob's. The Arkansas Supreme Court used comparability as just one of the numerous reasons why it reasonably concluded that Matthew's testimony would not have been mitigating enough to reasonably change the outcome at sympathy. In addition to it being potentially cumulative and being able to be impeached, what else is in what you just described as numerous reasons for affirming? Yes, Your Honor. The court, the Arkansas Supreme Court, listed four reasons why it thought Matthew's mitigation evidence had limited mitigation value, and then it took that proposed mitigation testimony, and it viewed the gruesomeness of the crime, the substantial aggravators, and determined that Matthew's, the addition of Matthew's testimony, would not have changed the outcome at sentencing, and that was reasonable. Had Matthew testified, the jury would have learned this truth about what went on in the Springs' household, that Springs not only abused Christina for decades, but he abused Christina in front of his children, and he abused Matthew too. A mere two weeks before Christina finally left Springs, he grabbed Matthew around the throat and hit him. This abuse resulted in a judge granting an order of protection against Springs that applied to Christina and Matthew too. The jury never heard any of this. Ms. Freely argues, though, that the State wouldn't have engaged in that cross-examination because it would have opened the door to asking Matthew about his mother, the victim here, also engaging in abuse of the children. What's your response to that argument? Asking Matthew about how his father abused him, and his father was the one on trial for capital murder, would not have opened the door at all to then presenting evidence that Christina had abused some of the children 10 years prior. Furthermore, Springs did not want any evidence at trial to come out that the victim, who he murdered, had previously abused any of the children. It wouldn't have opened the door at all to such evidence being presented. Counsel, do you know of some cases in which it was actually found that fair-minded jurists would uniformly agree that the State court unreasonably applied the Strickland standard? I'm asking, I guess, what is the kind of evidence that has been found to have been sufficiently prejudicial? I believe, Your Honor, those cases involved more mitigating evidence than here, such as really powerful mitigators. In this case, Matthew's testimony wasn't solely mitigating. He would have said that the children both loved and hated their father. There's a line in there that says, my dad treated our family right most of the time. Meaning, the rest of the time, Springs wasn't so great, such as when he was abusing Christina in front of her children and when he was abusing his children, too. This is just not the type of powerful mitigating evidence that would have resulted in a different outcome, as the Arkansas Supreme Court reasonably concluded. Matthew's testimony... Before the jury. Before the jury. The jury heard from 17 mitigation witnesses. And the theme was, of the whole defense case, was that Springs was a good family man, who had an out-of-character experience and snapped when Christina took his children away. The jury found mitigators, such as Springs was under unusual pressures at the time of the murder that he was in extreme emotional distress at the time of the murder. That he could not conform his conduct at the time of the murder due to mental disease or defect. And then a fourth one, the jury found that at least one of his children, being Jacob, had expressed a desire to learn why Springs murdered his mother. Those are the mitigating factors that the jury found in this case. Had Matthew been a part of this mitigation case, again, the jury would have learned even more aggravating evidence before it. It would have learned that Springs was a serial abuser. It would have actually learned the truth. Instead of mitigating the punishment, Matthew's testimony would have further cemented the death verdict. And the Arkansas Supreme Court recognized the limited value of Matthew's testimony and reasonably concluded that Springs failed to demonstrate strickling prejudice. And he simply cannot show that that decision was so objectively unreasonable that no fair-minded jurist could disagree about the proper resolution of that claim. Although opposing counsel hasn't mentioned it, the state stands by its briefing as to the issue of whether a COA should be granted on Springs' procedurally defaulted incompetency claim. And if there are no further questions, the director asks that this court affirm the district court's judgment dismissing this prejudice Springs' habeas petition. Thank you. Thank you, Ms. Gassaway. Ms. Fraley, your rebuttal? Yes, Your Honor. Three main points I'd like to make. First, looking at the mitigation case that was presented, the prosecutor in its closing argument at the penalty phase highlighted the weakness of defense counsel's presentation of 17 witnesses, none of whom lived in the house. We're talking about neighbors, clergy people, people that lived in the neighborhood that hadn't seen Thomas' interaction with the children in over a decade. The prosecutor highlighted that the only person within the house that the jury heard from was Jacob, and he had nothing nice to say. Hearing from Matthew would have eviscerated that argument. Hearing from Matthew, who lived in the home, who knew what his father was like, who knew that despite everything his father had done, he wanted him in his life and he loved him, would have eviscerated that argument and would have absolutely made a difference in the mind of at least one juror. Second, Your Honor, to your question about what kind of mitigation matters, what kind of cases has the court found prejudice in these circumstances, we would direct the court to Porter, where the evidence that the Supreme Court found mitigating, acknowledged would have opened the door to some negative things, and the court nonetheless found that that evidence was mitigating. But didn't Porter involve some evidence of traumatic brain injury? It did, Your Honor, and, you know, as the Supreme Court has pointed out, it has to do with the particular facts of the case. And I would direct this court, as I did in my 28-J, to Buck. There's an unusual confluence of factors in this case. The facts of Buck were far more horrendous than this case, far more horrendous. The defendant in that case murdered his girlfriend while her children begged for her life. And Justice Roberts, why didn't you? Just, you know, evidence of traumatic brain injury that counsel omits and does not present, I mean, that's pretty hard, pretty hard to defend. But in this situation, I mean, would you at least concede that there's a colorable argument to support a decision not to call the witness because of the risk of what would be revealed on cross-examination? No, Your Honor, and that issue isn't even before this Court. There's already a finding of deficiency. The Arkansas Supreme Court has already found that counsel were deficient for not calling Matthew. And that weighs against exactly what Your Honor is saying. The question is not whether trial counsel were reasonable or unreasonable for not presenting him. The Court already found it was unreasonable not to present his testimony. The question is, would it have caused one juror to strike a different balance? And in Buck, we were talking about two references, two small references to something inappropriate, that on facts more horrendous than this, Justice Roberts held would have made a difference. And in the horrible facts of that case, two small references would have made a difference. Testimony from Matthew that, despite everything, I love my father, would have made a difference in front of this jury, had already found a mitigating factor based on Jacob's testimony. And for these reasons, Your Honors, we would ask this Court to reverse the district court and remand this case for a new penalty hearing. Thank you. Thank you, Ms. Fraley. Thank you also, Ms. Gassaway. The Court appreciates both counsel's participation and argument before the Court this morning. It's been helpful, and we will continue to stay the record and render decision. Thank you. Counsel may be excused.